**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| Shauna B. Prince, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 5:22-cv-411 |
| | § | |
| v. | § | |
| | § | |
| Experian Information Solutions, Inc.; | § | |
| Equifax Information Services, LLC; | § | |
| TransUnion, LLC; Security Finance of | § | |
| Texas, LP d/b/a Continental Credit; and | § | |
| DOES 1 through 100 inclusive, | § | |
| | § | |
| Defendants. | § | |

COMES NOW Plaintiff **SHAUNA B. PRINCE** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1.     This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.     Defendant Security Finance of Texas, LP d/b/a Continental Credit ("Continental") is not reporting Plaintiff's account accurately as discharged in bankruptcy.

3.     Defendant Experian Information Solutions, Inc. is not reporting Plaintiff's AmeriCredit Financial Services, Inc. d/b/a GM Financial account ("GM") accurately as reaffirmed and paid in full.

4.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5.     A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported

on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

6.      The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

7.      In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

8.      Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

9.      Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

10.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

11.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

12.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

13.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

14.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

15.     Plaintiff alleges that the Continental account was included in her Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

16.     Despite the fact the account was discharged, Continental is reporting the account with a past due payment status, which is patently incorrect and misleading.

17.     Continental is not reporting the fact the debt was discharged anywhere on the tradeline on Plaintiff's Equifax or TransUnion credit reports. This is patently incorrect and misleading as it appears the debt was not discharged.

18.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged to be reported on a credit report with a past due payment status as this reporting makes it appear as if the debt was not discharged in bankruptcy.

19.     Plaintiff alleges that the GM account covers a motor vehicle that she reaffirmed in her bankruptcy. Subsequent to the reaffirmation, Plaintiff made payments on the vehicle until it was paid in full and fully satisfied on or about August 25, 2021.

20.     Plaintiff alleges that Experian is incorrectly and incompletely reporting the payment history on the GM account and is incorrectly reporting the GM account as included and discharged in bankruptcy.

21.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was reaffirmed and paid in full to be reported as included and discharged in bankruptcy.

22.     Plaintiff alleges that the FCRA requires complete and accurate reporting; therefore, a data furnisher or credit bureau cannot pick and choose which portions of the account to report. If an account is reported, then it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

23.     Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

24.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

25.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

26.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

27.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

28.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

29.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

30.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

31.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

32.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

33.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

34.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

35.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

36.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

37.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

38.     Each of the five (5) factors is weighted differently by FICO.

39.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

40.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

41.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

42.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

43.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

44.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

45.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.      e-OSCAR**

46.     e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

47.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

48.     The ACDV contains codes next to certain data fields associated with a credit file.

49.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

50.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

51.     For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.      Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

52.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

53.     Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

54.     The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

55.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

56.     The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

57.     The CII Code "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

58.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

59.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

60.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

61.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

62.     The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

63.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

64.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

65.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.     Plaintiff's Debt was Discharged Pursuant to her Bankruptcy**

66.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on June 9, 2021, in order to repair her creditworthiness and Credit Score.

67.     On or about June 25, 2021, Plaintiff executed a reaffirmation agreement, which matched the original terms of the prior agreement, and it was filed with the court on July 9, 2021 by GM ("Reaffirmation Agreement").

68.     The Chapter 7 Trustee's Report of No Distribution was entered on July 14, 2021.

69.     Plaintiff's bankruptcy was discharged on September 8, 2021.

70.     Plaintiff listed Continental in her schedules, and it received multiple notices throughout the bankruptcy, including the notice of the Order Discharging Debtor.

**E.      Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

71.     On December 30, 2021, Plaintiff ordered an Equifax credit report, an Experian credit report, and a TransUnion credit report to ensure proper reporting by Plaintiff's creditors (the "December 30 Credit Reports").

72.     Plaintiff noticed adverse tradelines in her December 30 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

73.     Plaintiff then disputed the inaccurate tradelines regarding the Continental account via certified mail to Equifax and TransUnion and the GM account via certified mail to Experian; all on or about January 18, 2021 (the "Dispute Letters").

74.     Plaintiff's Dispute Letters specifically put Continental on notice that Plaintiff filed for bankruptcy and received a discharge and the reporting should be updated.

75.     Plaintiff's Dispute Letters specifically put Experian on notice that Plaintiff's GM account was paid in full and should be updated. The Dispute Letter included a letter from Plaintiff's insurance company dated August 5, 2021 showing the full amount to be paid as well as a letter from GM dated September 2, 2021 showing the account was paid in full on August 25, 2021.

76.     Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

77.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

78.     Plaintiff is informed and believes that Equifax and TransUnion both received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to Continental, as the data furnisher, via an ACDV through e-OSCAR.

79.     Plaintiff is informed and believes that Experian received Plaintiff's Dispute Letters and, in response, inaccurately changed Plaintiff's GM account to report as discharged in bankruptcy and did not send the dispute to GM, as the data furnisher, via an ACDV through e-OSCAR.

80.     On February 28, 2022, Plaintiff ordered a second Equifax credit report, Experian credit report, and Experian credit report to determine if her accounts were updated.

### a.     Inaccuracy – Continental

81.     Despite actual knowledge, Continental continued to report Plaintiff's account, beginning in 5XXXX, to Equifax with a payment status of "Not more than three payments past due" and without notation of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy.

82.     Despite actual knowledge, Continental continued to report Plaintiff's account, beginning in 5XXXX, to TransUnion with a payment status of "60 days past due" and without notation of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy.

83.     Plaintiff alleges that Continental did not investigate whether Plaintiff filed for bankruptcy.

84.     Continental did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

85.     Equifax and TransUnion both provided notice to Continental that Plaintiff was disputing the inaccurate and misleading information, but Continental failed to conduct a reasonable investigation of the information as required by the FCRA.

86.     Based upon Plaintiff's disputes, Continental should have known that Plaintiff received a discharged in her bankruptcy proceedings.

87.     The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received her discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

88.     Plaintiff alleges that Continental did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

89.     If Continental reviewed such standards, Continental would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

90.     Continental should have updated the tradeline to CII Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the past due payment status.

91.     By continuing to report Plaintiff's account to Equifax as described in paragraph 81 and to TransUnion as described in paragraph 82, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which in inaccurate.

92.     Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

93.     As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status reported by Continental on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

94.     The lack of investigation and reporting of inaccurate and incomplete information by Continental is unreasonable.

**b.  Inaccuracy – GM**

95.     Despite actual knowledge, Experian updated Plaintiff's GM account, beginning in 459423XXX, to report a payment status of "Debt included in or discharged through Bankruptcy Chapter 7, 11, or 12", a "N" for negative in the month of June 2021 and a "-" for no data in the months of July and August 2021.

96.     This tradeline is patently incorrect as the account was reaffirmed and paid in full in August 2021.

97.     Plaintiff alleges that Experian was previously reporting the GM account as an open account, with a balance. After receiving Plaintiff's Dispute Letters regarding the full payment and satisfaction on the account, Experian did not conduct an investigation or send the dispute to GM Financial. Instead, Experian added a "N" in the payment history for June 2021 and changed the payment status to included or discharged in bankruptcy.

98.     Plaintiff alleges that Experian did not investigate whether Plaintiff reaffirmed the account, made payments, or paid the account in full.

99.     The GM account was at least partially reporting correctly prior to Plaintiff's dispute to Experian. However, instead of correcting the remainder of the tradeline, Experian erroneously changed the reporting to reflect in an inaccurate manner that is detrimental to Plaintiff's creditworthiness.

100.   Experian failed to provide notice to GM that Plaintiff was disputing the inaccurate and misleading information, and thus it failed to conduct a reasonable investigation of the information as required by the FCRA.

101.   Based on Plaintiff's dispute, provided payoff documentation, the prior reporting by GM on the account, and the Reaffirmation Agreement, Experian should have known that Plaintiff's account was not discharged due to the Reaffirmation Agreement and that the account was paid in full in August of 2021.

102.   The most basic investigation would include a simple review of the documents provided with the dispute, the public records of the bankruptcy (which shows the reaffirmation), and the fact GM was previously reporting the account as open and current, all compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

103.   Plaintiff alleges that Experian did not review if the GM account reporting complied with the FCRA or industry standards for credit reporting, the dispute letters it received from Plaintiff.

104.   Experian should have reported the CII Code as "R" and updated the account to show as paid in full as of August 2021.

105.   By inaccurately and incompletely reporting Plaintiff's GM account as described in paragraph 95, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was included and discharged in her bankruptcy. This makes Experian's reporting both patently incorrect and misleading.

106.   Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

107.   A discharged debt is treated far more derogatorily by a potential lender than one which is paid in full and reflects a consumer's ability to timely make payments month after month, year after year.

108.   As payment history makes up thirty-five percent (35%) of a consumer's credit score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and payment history reported on the GM account by Experian is lowering Plaintiff's

Credit Score, which adversely affects her ability to obtain credit. Further, even if a lender did look through the tradelines, based upon Experian's reporting, it appears as if Plaintiff's GM account was discharged in her bankruptcy, which is inaccurate.

109.    The lack of investigation and reporting of inaccurate and incomplete information by Experian is unreasonable.

**F.    Damages**

110.    Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

111.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

112.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Continental. Further, Plaintiff's diminished creditworthiness, resulting from Continental's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

113.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Experian on the GM account. Further, Plaintiff's diminished creditworthiness, resulting from Experian's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit

114.    Continental's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

115.    Experian's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

116.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Equifax, TransUnion, and Experian Each Failed to Assure Credit Reporting Accuracy**

117.    Equifax, TransUnion, and Experian (collectively "the CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

118.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Continental account as described herein.

119.    Equifax knew, or should have known, (1) that the Continental account was discharged in bankruptcy, and (2) that the account should not have been reported with a payment status of "Not more than three payments past due" as the debt was discharged. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

120.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the Continental account as described herein.

121.    TransUnion knew, or should have known, (1) that the Continental account was discharged in bankruptcy, and (2) that the account should not have been reported with a payment status of "60 days past due" as the debt was discharged. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

122.    Had Experian maintained reasonable procedures to assure maximum accuracy, Experian would never have inaccurately reported the GM account as described herein.

123.    Experian knew, or should have known, (1) that the GM account was not discharged in bankruptcy based on Plaintiff's dispute, and (2) that the GM account was reaffirmed and paid in full. Further, Experian knew, or should have known, that this inaccurate and incomplete reporting does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

124.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's creditworthiness, credit standing,

credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting the CRA Defendants allowed.

125. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

126. The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

127. The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

128. To the extent the CRA Defendants do send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

129. The CRA Defendants' respective employees receive little to no training concerning how to accurately report consumer debt.

130. Instead, the CRA Defendants' respective employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

131. The CRA Defendants' respective employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

132. The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

133. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

134.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

135.    In the alternative, the CRA Defendants were negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

136.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

137.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Continental Failed to Reinvestigate Following Plaintiff's Disputes**

138.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

139.    After receiving notice of the bankruptcy filing, Continental sent an AUD or monthly transmission to Equifax and TransUnion reporting the payment status as past due and did not report the appropriate CII.

140.    After receiving notice of the bankruptcy discharge, Continental continued its incorrect reporting to Equifax and TransUnion.

141.    After receiving the Dispute Letters, Continental did not correct the payment status with Equifax or TransUnion. Instead, Continental verified and re-reported the payment status as "Not more than three payments past due" via ACDV to Equifax and as "60 days past due" via ACDV to TransUnion. Further, Continental did not report the correct CII to accurately reflect that the debt was discharged.

142.    The payment status reported in an AUD, monthly transmission, or ACDV represents the status of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment

history, etc.). Therefore, even in the event the account was previously past due, if at all, it has no bearing on its pay status *after* the account was discharged in bankruptcy.

143.    Continental violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

144.    Equifax and TransUnion each provided notice to Continental that Plaintiff was disputing the inaccurate and misleading information; however, Continental either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

145.    Based on Plaintiff's disputes, Continental should have known its account was discharged in bankruptcy and ceased its inaccurate reporting.

146.    Reporting a discharged debt with a past due payment status is patently incorrect.

147.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Continental's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

148.    The lack of investigation by Continental, as required by the FCRA, is unreasonable.

**B.    Willful Violations**

149.    Plaintiff alleges that Continental has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

150.    Plaintiff further alleges that Continental has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

151.    Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Continental's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

152.    In the alternative, Continental was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

## C.    The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)

153.    Pursuant to 15 U.S.C. § 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Continental account.

154.    Pursuant to 15 U.S.C. § 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Continental account.

155.    Pursuant to 15 U.S.C. 1681i(a)(1), Experian was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the GM account.

156.    Thus, the CRA Defendants failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

157.    The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

158.    Plaintiff alleges the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

159.    Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

160.    The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

161. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that Continental was not reporting its account at issue correctly.

162. Had Equifax conducted a proper investigation, it could have closed or bookended the Continental debt by adding a notation on the tradeline to show that the debt was in fact discharged in bankruptcy and removed the past due payment status. However, Equifax continued to report the account as described herein.

163. In the alternative, Plaintiff alleges that Equifax did not send an ACDV to Continental to confirm accurate reporting on the account. Despite receiving the Dispute Letters providing notice of the inaccuracies, Equifax did not delete or correct the tradeline or conducted an investigation.

164. TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that Continental was not reporting its account at issue correctly.

165. Had TransUnion conducted a proper investigation, it could have closed or bookended the Continental debt by adding a notation on the tradeline to show that the debt was in fact discharged in bankruptcy and removed the past due payment status. However, TransUnion continued to report the account as described herein.

166. In the alternative, Plaintiff alleges that TransUnion did not send an ACDV to Continental to confirm accurate reporting on the account. Despite receiving the Dispute Letters providing notice of the inaccuracies, TransUnion did not delete or correct the tradeline or conducted an investigation.

167. Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that the GM account was not reporting correctly.

168. Had Experian conducted a proper investigation it could have updated the account as reaffirmed, closed, paid, and reflected the payment history from June through August 2021. It could have also removed the bankruptcy notations due to the reaffirmation. However, Experian instead inaccurately changed the reporting on the account as described herein.

169. Plaintiff alleges that Experian did not send an ACDV to GM to confirm accurate reporting on the account. Despite receiving the Dispute Letters providing notice of the inaccuracies, Experian did not delete or correct the tradeline or conducted an investigation.

170.    The CRA Defendants, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

171.    In the alternative, if the CRA Defendants deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), the CRA Defendants failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from either of the CRA Defendants, Plaintiff alleges each of the CRA Defendants deemed her Dispute Letters valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which neither complied.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

172.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Review and Consider all Relevant Information**

173.    The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

174.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

175.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

176.    In the alternative, the CRA Defendants were negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

177.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

178.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

179.    The CRA Defendants violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

180.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

181.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

182.    In the alternative, the CRA Defendants were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

183.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

184.    WHEREFORE, Plaintiff prays for judgment as follows:

a.    For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b.    Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.    Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.    Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.    For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

f.  For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: April 27, 2022

<u>*/s/ Kyle Schumacher*</u>
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.


**SCHUMACHER LANE PLLC**


Dated: April 27, 2022                           */s/ Kyle Schumacher*
                                                Kyle Schumacher
                                                Attorneys for Plaintiff